**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NANCY A. HEUER,** individually and as Successor Trustee of the William E. Heuer, Sr. and Anita Heuer Trust dated 06/06/2001, | ) ) ) | |
| | ) | **Case No. 1:23-cv-06153** |
| Plaintiff, | ) ) | |
| vs. | ) ) | **COMPLAINT FOR DAMAGES** |
| **BMO HARRIS BANK, N.A,** a national banking association; and | ) ) ) | **JURY DEMAND** |
| **DOVENMUEHLE MORTGAGE, INC.** d/b/a DMI, a Delaware corporation, | ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

Plaintiff, Nancy A. Heuer, individually, and as Successor Trustee of the William E. Heuer, Sr. and Anita Heuer Trust dated 06/06/2001 ("Plaintiff"), through counsel, for her complaint against BMO Harris Bank, N.A. ("BMO Harris"), and Dovenmuehle Mortgage, Inc. d/b/a DMI, ("DMI"), (collectively, "Defendants"), states:

**NATURE OF THE CASE**

1.     This action is brought to enforce regulations promulgated by the Consumer Financial Protection Bureau ("CFPB") that became effective on January 10, 2014, specifically, 12 C.F.R. §§1024.35, 1024.36, and 1024.41 of Regulation X. Additionally, this action seeks relief pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et. seq.*

**PARTIES, JURISDICTION, AND VENUE**

2.     Plaintiff owns the home at 810 Oregon Trail, Roselle, Illinois 60172 (the "Home").

1

3.     Plaintiff is a natural person who lives in and maintains the Home as her primary, principal residence.

4.     On March 10, 2011, William E. Heuer Sr. (deceased), individually, and as Trustee of the William E. Heuer Sr. and Anita Heuer Revocable Living Trust borrowed money and executed a note in the amount of $89,500.00 payable to Harris, N.A. (the "Note").

5.     To secure payment of that Note, William E. Heuer Sr. as Trustee of the William E. Heuer Sr. and Anita Heuer Revocable Living Trust Plaintiffs granted a contemporaneous mortgage lien on the Home (the "Mortgage"). The Note and Mortgage are collectively referred to herein as the "Loan."  A copy of the Loan is attached as Exhibits A and B to the Foreclosure Complaint, which is attached hereto as ***Exhibit 1***.

6.     The owner and holder of the Loan is now Federal Home Loan Mortgage Corporation ("Freddie Mac").

7.     Upon information and belief, BMO is the servicer of the Loan.

8.     Upon information and belief, DMI is the sub-servicer of the Loan.

9.     BMO is a national banking association headquartered in Chicago, Illinois.

10.     DMI is a foreign corporation formed under the laws of the State of Delaware with a principal place of business located at 1 Corporate Drive, Suite 350, Lake Zurich, Illinois 60047

11.     Jurisdiction is conferred by 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("DFA"), and the Real Estate Settlement Procedures Act, 12 U.S.C. §§2601, *et seq*. ("RESPA").

12.     Supplemental jurisdiction exists over Illinois Consumer Fraud and Deceptive Business Practices Act claim(s) ("ICFA") under 28 U.S.C. § 1367.

13.     Venue lies in this District pursuant to 28 U.S.C. §1391(b) as Defendants can be found in this District, a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and the property that is the subject of the action is located herein.

## SUMMARY OF CLAIMS

14.     In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

15.     Specifically, on January 17, 2013, the CFPB issued RESPA (Regulation X) and TILA (Regulation Z) Mortgage Servicing Final Rules, 78 F.R. 10901 (February 14, 2013) and 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

16.     The Loan is a "federally related mortgage loan" as defined by 12 C.F.R. §1024.2(b).

17.     Defendants are subject to these Regulations X and Z and do not qualify for an exception for "small servicers", as defined in 12 C.F.R. §1026.41(e)(4), nor the exemption for a "qualified lender", as defined in 12 C.F.R. §617.700.

18.     Plaintiff asserts claims for relief against Defendants for violations of the specific rules set forth in Regulations X and Z.

19.     Plaintiff asserts a private right of action under RESPA pursuant to 12 U.S.C. §2605(f), and any such action provides for remedies including actual damages, costs, statutory damages and attorneys' fees.

20.     Plaintiff asserts a private right of action under ICFA pursuant to 815 ILCS 505/10a, and any such action provides for remedies including actual damages, costs, punitive damages and attorneys' fees.

21.     At all relevant times, DMI was acting as an agent of BMO, BMO was DMI's principal, and DMI was acting within the course and scope of said agency relationship with the full knowledge and consent of BMO.

22.     Thus, each of the acts and omissions complained of herein were made known to and ratified by each Defendant.

### FACTS SUPPORTING CAUSES OF ACTION

23.     In 2020, Plaintiff fell behind on her home mortgage payments after an error occurred with her county property tax payments.

24.     BMO subsequently filed a foreclosure lawsuit. The lawsuit is pending in the Circuit Court of Cook County, Illinois, bearing case number 2022 CH 00007, and captioned as *BMO Harris Bank, N.A. v. Unknown Successor Trustees of the of the William E. Heuer Sr. and Anita J. Heuer Revocable Living Trust Agreement Dated June 6, 2001; Nancy A. Heuer as Possible Successor Trustee of the William E. Heuer Sr. and Anita J. Heuer Revocable Living Trust Agreement Dated June 6, 2001; The Trails Association, Inc.; Unknown Owners and Non-Record Claimants.* **Exhibit 1.**

25.     On October 18, 2022, DMI notified Plaintiff that she had been approved for a "Trial Period Plan for a mortgage modification" ("TPP"). A copy of the TPP agreement is attached as **Exhibit 2**.

26.     The mortgage modification product that Plaintiff was approved for is known as the Freddie Mac Flex Modification. *See id.*

27.      The TPP required three monthly payments on December 1, 2022, January 1, 2023, and February 1, 2023, each in the amount of $640.73. *Id.*

4

28.     DMI extended the TPP offer to "William E. Heuer Sr." and "Nancy Heuer", despite its knowledge that William E. Heuer Sr. is deceased.

29.     Plaintiff is the successor trustee of the revocable living trust in which title to the property is held.

30.     Plaintiff accepted the TPP and timely made each of the three required monthly payments. All of these payments were received by Defendants.

31.     Plaintiff made an additional monthly payment in the same amount on March 1, 2023, which was accepted by Defendants.

32.     Thereafter, DMI sent Plaintiff the Loan Modification approval cover letter dated, March 24, 2023, and accompanying Terms and Conditions of Loan Modification, and Loan Modification Agreement (collectively, "Loan Modification Package"). The Loan Modification Package is attached as ***Exhibit 3.***

33.     The cover letter to the Loan Modification Package, like most correspondence sent to Plaintiff or the Home by DMI, displays BMO's logo at the header of the document. It does not display DMI's logo or otherwise refer to or mention DMI by name.

34.     The cover letter to Loan Modification Package, like most correspondence sent to Plaintiff or the Home by DMI, displays the following return address: "Mortgage Servicing[,] 1 Corporate Drive[,] Suite 360[,] Lake Zurich, IL 60047-8945".

35.     The cover letter to Loan Modification Package, like most correspondence sent to Plaintiff or the Home by DMI, represents that it was generated and sent by BMO who may be contacted at the return address.

36.     The address Mortgage Servicing, 1 Corporate Drive, Suite 360, Lake Zurich, IL 60047-8945, is not BMO's address; instead, it is the address of DMI's corporate headquarters.

37.     Despite DMI addressing the TPP offer to the Plaintiff, and acceptance and performance of the consumer's obligations under the TPP by the Plaintiff, her name appears nowhere on the Loan Modification Agreement or associated documents.

38.     Plaintiff was not able to execute the Loan Modification Agreement because it did not contain a line for her signature.

39.     The Loan Modification Agreement was only drafted for execution by "WILLIAM E. HEUER, SR." on one line, and "WILLIAM E. HEUER, SR. AS TRUSTEE OF THE WILLIAM E. HEUER, SR. AND ANITA J. HEUER REVOCABLE LIVING TRUST, DATED JUNE 6TH 2001" on the other line.

40.     The Loan Modification Agreement also improperly called for an "Estimated Monthly Escrow Payment Amount" of $346.89, which it says may adjust periodically.

41.     Plaintiff notified Defendants of these errors and attempted to have them corrected, as pled herein below.

42.     In the meantime, Plaintiff has continued to make payments to Defendants in the amount called for in the TPP agreement, though she has received no valid modification agreement from Defendants and has not been told to do so. Specifically, Plaintiff has made the following payments to Defendants in person at a BMO branch:

$640.73 on or about April 1, 2023

$640.73 on or about May 1, 2023

$640.73 on or about June 1, 2023

$640.73 on or about July 1, 2023

$640.73 on or about August 1, 2023

43.     Defendants received and accepted each of the payments made by Plaintiff.

6

### PLAINTIFF'S ATTEMPTS TO HAVE DEFENDANTS' SERVICING ERRORS CORRECTED

44.     Plaintiff identified multiple servicing errors the Defendants committed with respect to the Loan Modification Agreement and notified Defendants of these errors with a Notice of Error pursuant to 12 C.F.R.§ 1024.35 prepared by one of her attorneys ("NOE").

45.     Plaintiff paid one of her attorneys to prepare and send the NOE to the Defendants.

46.     Said NOE was sent to the Defendants at their designated mailing address for receipt of same on April 5, 2023. The NOE is attached as **Exhibit 4.**[1]

47.     Defendants received said NOE at their designated address for receipt of same on April 11, 2023.

48.     In the NOE, Plaintiff raised the following multiple errors.

### Error #1

49.     Defendants failed to acknowledge that its borrower, William A. Heuer was deceased, despite knowing of his death as shown by its judicial filings in the foreclosure case and the TPP offer.

50.     Defendants' failure to acknowledge the death of William E. Heuer Sr. constitutes one (1) defined error as set forth in 12 C.F.R. § 1024.35(b)(11).

### Error #2

51.     Defendants failed to recognize Nancy A. Heuer as the Successor in Interest to William A. Heuer, deceased.

52.     The definition of Successor in Interest ("SII") is found at 12 CFR § 1026.2(a)(27), which states as follows: "(i) Successor in interest** means a person to whom an ownership interest

---

[1] For the sake of economy, **Exhibit 4,** the NOE, is included without its attachments, all of which are attached elsewhere as exhibits to this Complaint.

in a dwelling securing a closed-end consumer credit transaction is transferred from a consumer, provided that the transfer is:

(A) A transfer by devise, descent, or operation of law on the death of a joint tenant or tenant by the entirety;

(B) A transfer to a relative resulting from the death of the consumer;

(C) A transfer where the spouse or children of the consumer become an owner of the property;

(D) A transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of the consumer becomes an owner of the property; or

(E) A transfer into an inter vivos trust in which the consumer is and remains a beneficiary and which does not relate to a transfer of rights of occupancy in the property.

53.     Since Nancy A. Heuer is the Successor Trustee of the trust in which the property title is currently held, upon William E. Heuer's death, Nancy became the owner of the property and SII.

54.     Despite Defendants' clear existing knowledge that William E. Heuer is deceased and that Nancy A. Heuer is his SII, as shown through Defendants' prior actions and court filings, Defendants failed to recognize or acknowledge this in the loss mitigation process.

55.     Plaintiff attached a copy of William E. Heuer's death certificate to the NOE.

56.     Upon information and belief, Defendants already possessed this document since it appears as an exhibit to documents BMO filed in the Foreclosure Case.

57.     Defendants' failure to recognize Nancy A. Heuer as the SII to William E. Heuer Sr. constitutes one (1) defined error as set forth in 12 C.F.R. §§ 1024.35(b)(11) and 1026.2(a)(27).

**Error #3**

58.     Defendants failed to create a permanent loan modification agreement in the name of Nancy A. Heuer, and instead created one in the name of a person they knew to be deceased.

59.     Obviously, the logical and commonsense approach modifying loans is that a servicer cannot require a deceased borrower to sign a final Loan Modification Agreement.

60.     If a deceased borrower's loan is contractually required to be modified because the deceased borrower's SII fully performed the obligations under a TPP that was offered to the SII by name (as is the case here), the Loan Modification Agreement needs to be prepared in the name of the SII so that the SII can sign it.

61.     BMO' mortgagor and borrower could not be required to sign or otherwise be bound the Loan Modification Agreement because deceased people do not have the capacity to contract.

62.     The ability and right of a Successor in Interest to modify loans without the signature of their deceased transferor is required by RESPA, Regulation Z and the common law.

63.     Additionally, since the Loan is owned by Freddie Mac, its servicing guidelines apply, and Defendants are obligated to service the Loan in compliance with them.

64.     Section 9206.13(e) of said guidelines states the following:

> The Servicer must require all Borrowers and any other signatory to the Security Instrument to sign the modification agreement and all other required documents to qualify for a modification except the following: A Borrower, co-Borrower or any signatory to the Security Instrument who is deceased, as evidenced by a death certificate, or an obituary or newspaper article reporting the death.

65.     Defendants' failure to create a permanent loan modification agreement in the name of the SII to William E. Heuer Sr., Nancy A. Heuer, constitutes one (1) defined error as set forth in 12 C.F.R. § 1024.35(b)(11).

**Error #4**

66.     Defendants attempted to establish an escrow account with the Loan Modification Agreement.

67.     The Loan Modification Agreement also called for an "Estimated Monthly Escrow Payment Amount" of $346.89, which it says may adjust periodically.

68.     However, the borrower was not required to create or fund an escrow account at loan settlement.

69.     The borrower and his SII, Nancy A. Heuer, with the exception of only one single instance, have always paid the property taxes and insurance directly to their taxing authority and insurance company, respectively.

70.     An escrow account was established on this loan in January 2020 and BMO paid $6,628.68 in taxes to the Cook County Assessor. (This was due to an error with the Cook County Assessor that has since been resolved).

71.     After that error was corrected (BMO paid a single installment of taxes), the escrow account was closed and Nancy A. Heuer resumed paying the property taxes directly to the taxing authority.

72.     Recently, in a February 15, 2023 letter addressed to the deceased borrower and Nancy Heuer, BMO again declared the taxes to be delinquent when they, in fact, were not. The property taxes are current and paid directly by the Plaintiff, Nancy Heuer. BMO acknowledged its error in a March 16, 2023 letter addressed to the deceased borrower and Nancy Heuer. Both letters are attached hereto as ***Exhibit 5.***

73.     Defendants' establishment of and attempt to fund an escrow account for the Loan during the loss mitigation process and with Loan Modification Agreement, when the taxes are and

were paid directly by the borrower or his SII, constitutes one (1) defined error as set forth in 12 C.F.R. § 1024.35(b)(11).

74.     By and through the NOE, Plaintiff requested that Defendants correct its four (4) servicing errors by:

  a. Recognizing Nancy A. Heuer as the SII, treating her as the borrower, and sending correspondence confirming same to her attorney;

  b. Amending and revising the Loan Modification Agreement to be in the name of and for execution by Nancy A. Heuer, and Nancy A. Heuer as Sole Successor Trustee of the William E. Heuer Sr. and Anita J. Heuer Revocable Living Trust Agreement Date June 6, 2001;

  c. Amending and revising the Loan Modification Agreement to remove the escrow portion of the monthly payment from the required monthly payment amount stated in the Loan Modification Agreement to be due on May 1, 2023;

  d. Sending the amended and revised Loan Modification Agreement to Nancy A. Heuer at the property address via overnight delivery by UPS or other overnight courier, with a prepaid UPS or other overnight courier return envelope for her to return it to BMO once executed.

  e. Extending the deadline for execution and return of the Loan Modification Agreement by Nancy A. Heuer to BMO to a date that is no sooner than 14 (fourteen) days from the date it is dispatched to Nancy A. Heuer by overnight courier;

  f. Immediately dismissing the Foreclosure Case.

75.     By letter dated April 21, 2023, DMI sent one of Plaintiff's attorneys a response to the NOE ("NOE Response") which purported to respond to the errors raised in Plaintiff's NOE. A copy of the NOE Response is attached as *Exhibit 6*.

76.     Prior to Plaintiff's receipt of the NOE Response, one of her attorneys had already sent Defendants' foreclosure attorney the complete trust instrument for the William E. Heuer Sr. and Anita J. Heuer Revocable Living Trust Agreement.

77.     The trust instrument was sent to Defendants' foreclosure attorney by email on May 2, 2023, and its receipt was acknowledged by reply email.

78.     Despite the date on DMI's NOE Response, Plaintiff did not receive the NOE Response until weeks after that date.

79.     Like other correspondence sent to the Plaintiff about the Loan as alleged hereinabove, the NOE Response is on BMO letterhead but contains the return address of the corporate headquarters of DMI.

80.     The NOE Response also contains the National Multistate Licensing System and Registry ("NMLS") identification number 401052.

81.     NMLS number 401052 is registered to BMO at the address 1200 E. Warrenville Rd., 3D-146, Naperville, IL 60563.[2]

82.     The NOE Response was entirely created and sent by DMI, not BMO.

83.     In the NOE Response, DMI states that Defendants' position is that no errors occurred in the servicing of the Loan. But the NOE Response only responds to three of the four errors that the NOE identified:

---

[2] https://www.nmlsconsumeraccess.org/Home.aspx/SubSearch?searchText=401052 (last accessed August 25, 2023)

     a.   BMO's failure to recognize Nancy A. Heuer as the SII to William E. Heuer;

     b.   BMO's failure to create a permanent loan modification agreement in the name of Nancy A. Heuer; and

     c.   BMO's establishment of an Escrow Account with the permanent loan modification in violation of Regulation X.

84.    DMI's NOE Response states: "We have fully investigated the issues you raised and have determined that no action was required to address this/these issues(s) because no error occurred. Despite this conclusion and to improve your experience, we have taken the following steps: Our records show that we still need the TRUST CERTIFICATE SIGNED BY THE CURRENT TRUSTEE from your client to have her confirmed as Successor in Interest and to be reviewed to assume the loan." ***Exhibit 6*** (emphasis in original).

85.    With respect to the other two errors DMI acknowledged, DMI's NOE Response regurgitates the same paragraph alleged above, but adds the line: "Please note that we can confirm our records indicate that your client Ms. Nancy Heuer has not been verified as a bona fide successor in interest." *Id.*

86.    The NOE Response did not provide Plaintiff or her attorney with any such "trust certificate" for her to sign, and did not explain what such a document would need to contain.

87.    The NOE Response did not provide Plaintiff or her attorney any documents relating to or an application for an assumption of the loan by the Plaintiff.

88.    The NOE Response did not directly address or respond to Error #1.

89.    On May 30, 2023, one of Plaintiff's attorneys emailed Defendants' foreclosure attorney to inquire whether there was an update on Plaintiff's requested corrections to the final

Loan Modification Agreement, and to inform Defendants that Plaintiff had not received their response to her NOE.

90.     Defendants' foreclosure attorney's response to that email was: "My client tells me they're looking for a copy of a trust certificate signed by Ms. Heuer so they can issue the corrected/new mod docs." Said email correspondence is attached hereto as *Exhibit 7.*

91.     On May 31, 2023, one of Plaintiff's attorneys inquired by email to Defendants' foreclosure attorney about what the request for a trust certificate meant, and to reiterate that he had already sent Defendants the memorandum of trust and the full trust instrument.

92.     Defendants' foreclosure attorney's response to that email was: "If I understand my client rep correctly, if your client just signs a copy of the trust that should do it." Said email correspondence is attached hereto as *Exhibit 8.*

93.     Plaintiff was not the settlor of the trust, she is the sole Successor Trustee, and there is no location on the trust instrument that would be appropriate for her signature to be placed.

94.     A "certificate of trust" is not a concept under Illinois law.

95.     A Certification of Trust is a creation of Illinois statute.

96.     A Certification of Trust is an instrument used in situations where the trustee does not want or is not able to provide the complete trust instrument to a third-party. It gives the third-party a safe harbor it can rely on in the absence of the trust instrument. *See* 760 ILCS 3/1013 ("Instead of furnishing a copy of the trust instrument to a person other than a beneficiary, the trustee may furnish to the person a certification of trust containing the following information:...").

97.     Even if Defendants meant to request a Certification of Trust when they and their lawyer repeatedly requested other things instead (e.g., a "certificate of trust" and to "just sign[s] a copy of the trust"), Plaintiff was not required to take such additional actions where, as here, the

complete trust instrument and death certificate of the borrower had already been provided to the Defendants, and those are all that were required for the Defendants to confirm Plaintiff as the bona fide SII.

98.    The borrower's death certificate is attached hereto as ***Exhibit 9.***

## DEFENDANTS ENGAGE IN DUAL TRACKING

99.    The Plaintiff accepted the TPP, made the three (3) required payments which were received by Defendants, and thereafter made six (6) additional payments which were also received by Defendants.

100.    Additionally, the Plaintiff through one of her attorneys continued to inquire of the Defendants through one of their attorneys about why it was being requested of Plaintiff that she take unnecessary, extrajudicial actions in order to be recognized as the SII and receive the permanent modification she had become entitled to by performing her obligations under the TPP.

101.    Despite these facts, on August 10, 2023, Defendants resumed prosecuting the foreclosure action by filing a motion in the Foreclosure Case against Plaintiff for judgment of foreclosure and sale of her Home ("Judgment Motion"). Notice of that motion, and the judgment and selling officer motions without their exhibits, are attached hereto as ***Exhibit 10.***

102.    A portion of DMI's records for the Loan attached to the Judgment Motions lists the names of both William E. Heuer Sr. and Nancy A. Heuer (the Plaintiff). Same is attached hereto as ***Exhibit 11.***

103.    There is also a loss mitigation affidavit attached to BMO's Judgment Motions. Same is attached hereto as ***Exhibit 12.***

104.    In the loss mitigation affidavit Defendants assert, falsely, that "[a]n assumption is needed in order to complete a final modification." *Id.*

105. Servicing notes attached to the Judgment Motions indicate that Plaintiff was to be sent an application or package for her to complete in order to assume the Loan.

106. Plaintiff was never sent an application or package for her to complete in order to assume the Loan.

107. Had Defendants inquired into Plaintiff's creditworthiness, they would have discovered that she is an exceptionally good credit risk, having a FICO score of 825 and a perfect payment history ("never late") on all of her lines of credit since the date they were established, or for as far back they are reported to the credit reporting agencies.

## IMPACT ON AND DAMAGE TO PLAINTIFF

108. Plaintiff reached out to Defendants for help in 2020 when the property tax error created circumstances that led to her default. Since that time, the Plaintiff has endeavored to modify the Loan and has diligently provided Defendants with acceptance of the TPP, payment of the required three payments, continued good faith payments thereafter and everything that was necessary for her to be confirmed as the SII.

109. The Plaintiff expected that Defendants would send her a permanent modification agreement that she was able to sign following her complete performance of the TPP and provision of the information required to confirm her as the SII. Instead, Defendants sought a judgment of foreclosure and sale of the Home.

110. Instead of being treated fairly by Defendants as a customer should be, Plaintiff was met with callous indifference and a misguided determination to steamroll the foreclosure through to sale.

111. The Plaintiff had to employ counsel to represent her interest in the Foreclosure Case and to prepare the NOE.

112.    The impact of Defendants' conduct on the Plaintiff has been severe - emotionally and financially.

113.    Plaintiff has endured severe emotional distress directly and proximately caused by the Defendants' conduct. This stress is driven by the daily ongoing fear that Plaintiff and her family might lose their Home in foreclosure and be forced to leave their Home. This stress and fear have resulted in loss of sleep, anxiety, depression, embarrassment, and other significant and persistent emotional distress.

114.    The actions of Defendants have further caused Plaintiff to remain unnecessarily in a default status on the Loan and remain in foreclosure for a significantly longer time than she would have if Defendants had acted appropriately and with reasonable diligence in handling the modification, confirming Plaintiff as the SII, and in resolving the errors alleged.

115.    Defendants' actions have caused Plaintiff to incur actual damages including filing fees, attorneys' fees to defend the Foreclosure Case and to seek a stay to prevent Defendants' unlawful dual tracking, costs and expenses for the investigation and preparation of the NOE, the review of any response made by DMI, and the preparation and prosecution of this action.

116.    Throughout this entire ordeal, the Plaintiff has merely wanted to save her family's Home. She has repeatedly asked Defendants to just fix the errors alleged, provide the promised loan modification, and cease their efforts to sell the Home. Defendants have steadfastly failed and refused to do so.

117.    DMI has engaged in a pattern and practice of mistreating mortgage loan borrowers and violating provisions of the Real Estate Settlement Procedure Act, 12 U.S.C. §§2605, 2617, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("RESPA"). As

set forth, infra, Plaintiffs have alleged not less than four (4) violations which demonstrate said pattern and practice.

118.     DMI has continued to service consumer loans in a manner which results in widespread consumer harm. DMI fails to maintain proper policies and procedures and to train and educate its employees in a manner that does not result in consumer harm. Defendants must be held to account for DMI's abusive and deceitful conduct.

<u>**COUNT ONE**</u>
**(BMO and DMI)**

**Violation of 12 C.F.R. §1024.35(e)**

**[DMI's Failure to Properly Respond to Multiple
Errors in Violation of 12 C.F.R. §1024.35]**

119.     Plaintiff restates and incorporates all of her statements and allegations contained in paragraphs 1 through 118 in their entirety, as if fully rewritten herein.

120.     12 C.F.R. §1024.35(e)(1) provides that a servicer must respond to a notice of error by either correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or, conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

121.     Plaintiff asserted four (4) specific servicing errors in the NOE.

122. DMI failed to reasonably investigate and respond to the alleged errors contained in the NOE and instead sent responses which indicated that it had not conducted any reasonable investigation or provided information which was false or misleading.

123. Any reasonable investigation into the errors alleged would reveal that Defendants failed to act with due diligence in implementing the modification and recognition of the Plaintiff as the SII to BMO's deceased borrower.

124. DMI's actions, in failing to conduct a reasonable investigation of the errors alleged constitute clear and material violations of 12 C.F.R. §1024.35(e).

125. DMI's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiff's rights.

126. As a result of DMI's actions, Defendants are liable to Plaintiff for actual damages, as described, *supra*, as well as for statutory damages, costs, and attorneys' fees.

**WHEREFORE,** the Plaintiff prays for the entry of judgment in her favor and against Defendants, as follows:

A. For actual damages, all costs and reasonable attorney fees;

B. For statutory damages of Two Thousand Dollars ($2,000.00) for each and every violation contained in Count One;

C. For all other relief this Court may deem just and proper.

## COUNT TWO
### (BMO and DMI)

### Violation of 12 C.F.R. § 1024.41(g)

### [Dual Tracking]

127. Plaintiff restates and incorporates all of their statements and allegations contained in paragraphs 1 through 118 in their entirety, as if fully rewritten herein.

128.    12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))".

129.    12 C.F.R. § 1024.41(g) provides that if a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless: (1) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied; (2) The borrower rejects all loss mitigation options offered by the servicer; or (3) The borrower fails to perform under an agreement on a loss mitigation option.

130.    Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(g) provides that the prohibition on a servicer moving for judgment or order of sale includes making a dispositive motion for foreclosure judgment, such as a motion for default judgment, judgment on the pleadings, or summary judgment, which may directly result in a judgment of foreclosure or order of sale. A servicer that has made any such motion before receiving a complete loss mitigation application has not moved for a foreclosure judgment or order of sale if the servicer takes reasonable steps to avoid a ruling on such motion or issuance of such order prior to completing the procedures required by § 1024.41, notwithstanding whether any such action successfully avoids a ruling on a dispositive motion or issuance of an order of sale.

131.    Defendants' actions in moving toward the sale of the Home while a loss mitigation application--the pending permanent modification of the Loan and recognition of Plaintiff as the SII--were pending, constitute a clear and egregious violation of 12 C.F.R. § 1024.41(g).

132.    Defendants' actions are part of a pattern and practice of behavior in conscious disregard for the rights of Plaintiff and consumers generally.

133.    In addition to the damages outlined, *supra*, Defendants' violation of 12 C.F.R. § 1024.41(g) directly and proximately caused Plaintiff to incur actual damages including but not limited to attorneys' fees in retaining counsel to attempt to stay the foreclosure judgment and sale of the Home.

134.    Defendants are liable to Plaintiff for actual damages, statutory damages, costs, and attorneys' fees.

**WHEREFORE,** the Plaintiff prays for the entry of judgment in her favor and against Defendants, as follows:

A.      For actual damages, all costs and reasonable attorney fees;

B.      For statutory damages of Two Thousand Dollars ($2,000.00) for each and every violation contained in Count Two;

C.      For all other relief this Court may deem just and proper.

<u>**COUNT THREE**</u>
**(BMO and DMI)**

**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505**
*et. seq.*

135.    Plaintiff restates and incorporates all of her statements and allegations contained in paragraphs 1 through 134 in their entirety, as if fully rewritten herein.

136.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq*. (the "Act" or "ICFA"), is intended to protect consumers against unfair or deceptive acts and fraud in conduct of trade or commerce.

137.    The ICFA provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act,". . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

138.    Plaintiff is a "person" as defined by 815 ILCS 505/1(c).

139.    Plaintiff is a "consumer" as defined by 815 ILCS 505/1(f).

140.    DMI is engaged in "commerce" as defined by 815 ILCS 505/1(f).

141.    BMO is engaged in "commerce" as defined by 815 ILCS 505/1(f).

142.    Defendants engaged in unfair and deceptive acts in their dealings with Plaintiff.

143.    Plaintiff may predicate an ICFA unfairness claim on violations of other statutes or regulations, even those that themselves do not allow for private enforcement.

144.    With respect to unfairness, Defendants were obligated under RESPA, Regulation X and/or Regulation Z to provide the following to consumers for all the loans they serviced:

a.    Accurate and complete account information;

b.    Complete and accurate investigation of alleged errors or inaccuracies;

c.    Prompt remediation of errors and inaccuracies;

d.    Adequate staffing for their loss mitigation departments;

e.    Adequate training for their foreclosure and loss mitigation staff;

22

    f.   Proper, truthful and accurate communications including regarding loss mitigation and loan modification efforts;

    g.   Accurate and prompt processing of loss mitigation and loan modifications;

    h.   Accurate and prompt recognition of a consumer as a bona fide SII entitled to be treated as the borrower upon that person's submission of the legally required documentation;

    i.   Accurate and prompt recognition of someone as a bona fide SII entitled to be treated as the borrower without requiring that person to supply documents or information that are additional to anything that is required under state and federal law;

    j.   Prompt posting of payments, including trial modification payments;

    k.   Adequate infrastructure and effective personnel to provide basic mortgage servicing systems that did not harm consumers;

    l.   Accurate final modification agreements timely upon borrower completion of a TPP;

    m.  Loss mitigation review and implementation without simultaneously progressing a foreclosure case toward judgment and sale;

145.   With respect to Freddie Mac Guidelines, Defendants were obligated to create and send Plaintiff a loan modification agreement that she could execute in her name alone without first requiring that she assume the loan.

146.   Defendants failed to provide any of these things for Plaintiff.

147.   While servicing Plaintiff's Loan, Defendants breached Freddie Mac Guidelines, RESPA, Regulation X, Regulation Y and ICFA.

148.     With regard to deception, Defendants engaged in each of the following deceptive acts, with the full intent that Plaintiff rely upon them:

      a.  Defendants sent correspondence apparently in the name of BMO when really DMI was the author and sender of the correspondence;

      b.  DMI misrepresented that it was BMO, when in fact the entities are separate and distinct from each other;

      c.  Defendants represented to Plaintiff that her loan would be modified if she made the payments called for under the TPP;

      d.  Defendants represented to Plaintiff that her loan would be modified after she made three payments under the TPP;

      e.  By addressing the TPP offer to Plaintiff and accepting six of her payments, Defendants represented to Plaintiff that it would offer her a permanent modification that she could sign after she completed the TPP;

      f.  Defendants falsely represent in the Foreclosure Case Judgment Motions and NOE response that they can require Plaintiff to assume the loan before becoming obligated to offer her the permanent modification that she is already entitled to;

      g.  Defendants falsely represent that Plaintiff is not entitled to loss mitigation and recognition as the SII until she assumes the loan;

      h.  Contrary to their legal obligations, Defendants seek to require Plaintiff to take multiple and conflicting actions before they will recognize her as the SII, when she has already taken all the actions required of her and is already entitled to be recognized as the SII;

24

i.   Defendants failed to disclose to Plaintiff that they would re-commence foreclosure and resume collection after Plaintiff had performed under the TPP;

j.   Defendants failed to disclose to Plaintiff that they would not permanently modify the loan if she performed under the TPP;

k.   Defendants failed to provide Plaintiff an application or information for an assumption of the loan, despite recording in its own records that it needed to provide those things to the Plaintiff;

l.   Defendants purportedly cancelled Plaintiff's loss mitigation process for her failure to assume the loan when it never provided information, or an application or mechanism to allow that assumption to occur.

149.   Defendants intended that Plaintiff rely upon their deception.

150.   As a direct and proximate result of Defendants' unfair and deceptive acts, materially false statements and omissions, Plaintiff has suffered damages as detailed herein above.

151.   Plaintiff seeks such economic and non-economic damages as a jury deems reasonable and may award after hearing the evidence in this case.

152.   Plaintiff also seeks an award of punitive damages commensurate with the massive consumer harm inflicted by Defendants on Plaintiff and the thousands of other consumers needlessly harmed by Defendants. Plaintiff also requests that the Court award her statutory attorney's fees and the costs of the litigation.

**WHEREFORE**, Plaintiff requests the Court enter judgment in her favor against the Defendants as follows:

A.   Declaring that the conduct of Defendants as alleged herein is unlawful and violates the ICFA, 815 ILCS 505 *et seq.*

B.   Awarding actual damages in an amount to be proved at trial, punitive damages, costs of this action including expenses, together with reasonable attorney's fees as determined by this Court; and

C.   Awarding all other relief this Court deems just and equitable.

## JURY DEMAND

Plaintiff, Nancy A. Heuer, individually and as Successor Trustee of the William E. Heuer, Sr. and Anita Heuer Trust dated 06/06/2001, hereby respectfully demands a trial by jury on all such claims that may be so tried.

*Respectfully submitted,*

*/s/ Nick Wooten*

Nick Wooten
DC LAW, PLLC
1012 West Anderson Lane
Austin, Texas 78757
(512) 888-9999
nick@texasjustice.com
*(Lead Trial Attorney)*

Adam J. Feuer
Majdi Hijazin
DC LAW, PLLC
20 North Clark Street
Suite 3300
Chicago, Illinois 60601
(872) 804-3400
adam@chicagojustice.law
majdi@chicagojustice.law

*Counsel for Plaintiff*